IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | | |
|---|---|---|
| KRISTINA M. ALLEN, | ) | |
| | ) | |
| Plaintiff, | ) | Civil No. 08-276-JE |
| | ) | |
| v. | ) | OPINION AND ORDER |
| | ) | |
| MICHAEL J. ASTRUE, Commissioner | ) | |
| of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

Richard A. Sly
1001 S.W. 5th Avenue, Suite 310
Portland, OR 97204

Linda Ziskin
P.O. Box 2237
Lake Oswego, OR 97035

        Attorneys for Plaintiff


Kent Robinson
U.S. Attorney, District of Oregon
Adrian L. Brown
Asst. U.S. Attorney
1000 S.W. Third Avenue, Suite 600
Portland, OR 97204-2902

Terrye E. Shea
Special Asst. U.S. Attorney
Asst. Regional Counsel
Social Security Administration
701 5th Avenue, Suite 2900 M/S 901
Seattle, WA 98104-7075

      Attorneys for Defendant

JELDERKS, Magistrate Judge:

Plaintiff Kristina Allen brings this action pursuant to 42 U.S.C. § 405(g) seeking judicial review of a final decision of the Commissioner of Social Security (the Commissioner) denying her application for Supplemental Security Income (SSI) benefits under Title XVI of the Social Security Act (the Act), 42 U.S.C. §§ 1381-1383f.  For the reasons set out below, the Commissioner's decision is affirmed.


Procedural Background

Plaintiff filed applications for SSI benefits on March 24, 1998, and October 26, 1999. Those applications were denied initially, were not pursued, and are not relevant to the application at issue in this proceeding.

Plaintiff filed her underlying application for SSI benefits on March 6, 2002, alleging that on various dates in 1997 she had become disabled because of disturbed sleep, fatigue, depression, anxiety, nightmares, and back pain.  After her claim was denied initially and upon reconsideration, plaintiff timely requested a hearing before an Administrative Law Judge (ALJ).

On December 9, 2003, a hearing was held before ALJ Tim Terrill in Portland, Oregon.  Plaintiff; Barry Franklin, plaintiff's friend; and Kay Hartgrave, a Vocational Expert (VE); testified at the hearing.

In a decision issued on January 31, 2004, ALJ Terrill found that, despite her severe impairments, plaintiff retained the capacity to perform simple, repetitive, routine work with

no interaction with the public and only occasional interaction with co-workers. Accordingly, he found that she was not disabled within the meaning of the Act.

After the Appeals Council denied plaintiff's request for review, plaintiff appealed the denial of her application for benefits to the United States District Court for the District of Oregon. In a decision filed on March 20, 2006, the court remanded the case to the Agency for a further determination as to whether plaintiff's bipolar disorder and borderline personality traits were "severe" impairments, and if so, whether alone or in combination, they met or equaled an impairment in the "listings." The court concluded that further proceedings were necessary because, even if the court credited the diagnoses of bipolar disorder and borderline personality traits and the findings of treating and examining physicians, it was "not clear that Allen is entitled to benefits." TR. at 641.

On remand, a hearing was first scheduled for June 20, 2006, again before ALJ Terrill. That hearing was continued to allow the Medical Expert (ME) time to review additional medical records, and for plaintiff to be referred for a mental status evaluation. ALJ Terrill reconvened the hearing on remand on January 31, 2007. Plaintiff and Dr. Hart, an ME, testified at the hearing. A VE was present, but did not testify.

In a decision issued on March 17, 2007, ALJ Terrill found that plaintiff was disabled because of her physical and mental impairments, including substance abuse, but that, if she stopped her substance use, she would be capable of making a successful adjustment to work that existed in significant numbers in the national economy. Accordingly, the ALJ concluded that a finding of "not disabled" was appropriate because plaintiff's substance abuse was material to a finding of disability. See 20 C.F.R. § 416.935. That decision became the final decision of the Commissioner on August 6, 2007, when the Appeals Council denied plaintiff's request for review.

In the present action, plaintiff challenges the Commissioner's decision that she is not disabled within the meaning of the Act. She asserts that the Commissioner's decision should

be reversed, and that this action should be remanded for an award of benefits.  In the alternative, plaintiff contends that the action should be remanded for further proceedings.

<u>Factual Background</u>

Plaintiff was born on October 21, 1979, and was 29 years old at the time of her most recent hearing before the ALJ.  She has an eleventh grade education.   Plaintiff has worked as a babysitter and at a fast food restaurant, but has never engaged in substantial gainful work activity.  Plaintiff asserts that she is disabled because of combined impairments, including depression, anxiety, post-traumatic stress disorder (PTSD), bipolar disorder, substance abuse, and a personality disorder.  She has an objectively verifiable lumbar spine injury, and occasionally experiences abdominal pain.

<u>Medical Record</u>

1. <u>Record developed before remand</u>

Plaintiff displayed behavioral problems at a young age and attended special education classes from an early age.  She threatened suicide a number of times while she was young, was classified as "seriously behaviorally disabled," and began to receive counseling when she was 11 years old.  Plaintiff required remedial academic assistance in mathematics, English, and reading.  She attended an alternative high school, and continued to receive special educational services until she dropped out in 1997.

Plaintiff was sexually abused on numerous occasions during her youth.  She was admitted to the psychiatric ward at Puget Sound Hospital on February 15, 1997, after stabbing herself in the abdomen with a large knife.  Dr. Timothy Earnest, a treating psychiatrist, noted that plaintiff's stepfather reported that plaintiff had been sexually molested when she was two years old, and that she had been placed in foster care when he and plaintiff's mother were arrested for possession of marijuana.  Plaintiff's stepfather reported that plaintiff had been molested at age five, age seven, and age 12.  He also stated that

4 - OPINION AND ORDER

plaintiff had been a "closet alcoholic" since she was eleven years old, and had threatened to kill herself a number of times.  Plaintiff's stepfather acknowledged that he had hit plaintiff in the face when she was 14, after which he had been arrested, placed on probation and work-release, and been subject to a restraining order for one year.  He reported that plaintiff had been beaten by her current boyfriend, and remained in that relationship.

Dr. Earnest noted that plaintiff displayed slowed speech, some psychomotor slowing, a dysthymic and somewhat anxious affect, and poor insight and judgment.  He opined that plaintiff's history of poor judgment and problem-solving skills placed plaintiff at an increased risk for chronic psychiatric illness, and diagnosed a depressive disorder, alcohol abuse, cannabis abuse, and borderline personality traits.

Plaintiff was treated at Comprehensive Mental Health from January, 1997, through June, 1998.  Records from that treatment indicate that plaintiff displayed anger, anxiety, apprehension, depression, and sadness.  Plaintiff's abilities to manage daily living activities and to make reasonable life decisions were characterized as impaired.  A note dated January 8, 1998, indicated that plaintiff had been sexually and physically abused, and that plaintiff's boyfriend, who had abused her, was currently jailed on charges that he had assaulted her.  The notation indicated that plaintiff had been sober for three months.  Plaintiff was depressed and withdrawn, had eating and sleeping problems, and had displayed suicidal ideation and made suicide attempts in the past.  A dysthymic disorder and major depressive disorder, recurrent, unspecified, were diagnosed, and plaintiff's current Global Assessment of Functioning (GAF) was rated at 50.

In a record dated April 28, 1998, plaintiff's counselor noted substance abuse and depressive symptoms, and indicated that plaintiff had missed a 12:30 p.m. appointment, which plaintiff said happened because she overslept.  On June 17, 1998, plaintiff and her boyfriend were evicted from the boyfriend's grandfather's home following an accusation of substance abuse, which plaintiff denied.  Plaintiff then moved into what her counselor described as an "extremely unstable living situation" which was likely "not a clean and sober

place."  Plaintiff was asleep at 12:30 p.m. when her counselor visited on June 29, 1998, and the counselor noted that she had cut her hair "in spots all over" her head.  Plaintiff's counselor subsequently noted that plaintiff disappeared and could not be located, and services were discontinued.

Plaintiff contacted Comprehensive Mental Health and requested treatment and Zoloft nearly a year later, on June 23, 1999.  However, she missed her next appointment, which was scheduled for July 14, 1999.

Plaintiff was evaluated for depression by the Clackamas County Mental Health Center on April 3, 2000.  Plaintiff reported that she had been extremely lonely and depressed since being abandoned by her mother in 1996, and said that she had gone to an emergency room three weeks earlier after she attempted to choke and strangle herself.  She indicated that she was pregnant.  Plaintiff was diagnosed with dysthymia aggravated by poverty, pregnancy, and social isolation.  Her GAF was assessed at 50, and she was referred for therapy.  Plaintiff missed most of her group therapy appointments.

On April 23, 2001, plaintiff established care with Dr. Melinda Tonelli through Legacy Health System.  Plaintiff reported anxiety with mood swings, anger and rage, isolation, and fatigue.  Plaintiff told Dr. Tonelli that she had restarted Zoloft, and it was "helping a little."  Plaintiff was living with her boyfriend and her four-month-old daughter.

On May 14, 2001, plaintiff reported that her depression had improved, but not gone away, following a prescribed change from Zoloft to Remeron.  Dr. Tonelli noted that she presented with a flat affect, and noted that she reported that she sometimes heard voices and thought someone was watching her.

On October 26, 2001, plaintiff presented with lower abdominal pain, anxiety, and depression.  A trial of Paxil was planned, because Remeron had made her too sleepy.

Plaintiff was admitted to the psychiatric ward of Legacy Good Samaritan Hospital on February 2, 2002, because of suicidal ideation and an inability to contract for her safety. Jamie Read, M.D, a psychiatrist, examined and treated plaintiff.  Dr. Read noted that plaintiff

was admitted because she stated that she was suicidal and did not feel that it would be safe to go home.  Plaintiff was teary, and reported poor sleep, appetite, and concentration.  Though she reported suicidal ideation, plaintiff soon wanted to be discharged, and denied that she had said she was suicidal.  She became very angry and yelled at Dr. Read.

Dr. Read diagnosed plaintiff with suicidal ideation, prior to admission, and bipolar disorder-mixed state.  She rated plaintiff's GAF at 40.  Plaintiff's husband wanted plaintiff to remain hospitalized, and her voluntary admission status was converted to an involuntary hold.  Dr. Read described plaintiff as

> a 22 year-old woman who has a history of depression, since 1996, with an episode at that time.  She then had a postpartum depression, starting in October, 2001, did well for a brief time period on medications, went off her medications, has been back on them for two months.  However, as her depression improved, she slipped more into a bipolar mixed state and has now become quite anxious and overwhelmed, with racing thoughts, sleep disturbance, and intermittent suicidal thoughts.

Dr. Read planned to taper plaintiff off Paxil, and begin Depakote–a medication prescribed for bipolar disorder–supplemented by Ativan for anxiety.

Luke Patrick, Ph.D., conducted a consultative psychodiagnostic evaluation of plaintiff on May 8, 2002.  Dr. Patrick reviewed two records from Network Behavioral Healthcare, dated February 27, 2002, and March 5, 2002, and administered no tests.

Dr. Patrick noted that plaintiff was late for her interview, after reportedly becoming confused about the bus route.  Based on plaintiff's interview, Dr. Patrick opined that plaintiff met the criteria for major depressive disorder with notable features of agitation and irritability, but did not meet the criteria for bipolar disorder.  He stated that, although plaintiff became agitated and irritable, "this appears to be in the course of her depression," and she had not experienced the sleeplessness, euphoria, or risky behaviors associated with a manic episode.  Dr. Patrick also opined that plaintiff did not appear to meet the "full criteria for borderline personality disorder."  He noted that plaintiff "clearly has a past history" of drug and alcohol abuse that raised concern, but that there was not "specific evidence" in his

evaluation to counter plaintiff's assertion that, other than drinking alcohol on one occasion, she had not "used" during the previous three years.

Addressing plaintiff's ability to work, Dr. Patrick noted that plaintiff "certainly has shown a spotty vocational history at best."  He opined that this was "likely influenced by both psychosocial factors as well as possibly limited intellectual functioning."  Dr. Patrick added that, in particular, plaintiff "may lack some of the attentional and/or basic achievement skills necessary for many forms of work," and opined that cognitive testing might be useful to help clarify this issue "and make further recommendations regarding vocational training and related options."  He diagnosed Major Depressive Disorder, recurrent, and a past history of methamphetamine and alcohol abuse.

Plaintiff received mental health care from Mt. Hood Community Mental Health Center and Cascadia Behavioral Healthcare from May, 2002, through early July, 2003.  An intake mental health assessment at Cascadia Behavioral Healthcare noted that plaintiff reported that she heard voices and felt a "push to suicide."  The assessment noted plaintiff's substantial history of trauma and abuse, and her history of methamphetamine, marijuana, and alcohol use and abuse.  Plaintiff reported low self-esteem, self harm, anger, anxiety, difficulty concentrating, frequent crying, depressed moods, excessive worry, hopelessness, poor impulse control, difficulty making decisions, lack of motivation, memory loss, mood swings, nervousness, nightmares, panic attacks, racing thoughts, and sleep difficulties. Plaintiff was diagnosed with PTSD, Major Depressive Disorder, and Bipolar disorder, and her GAF was rated at 50.  She was assigned to individual and group therapy, and missed half of her group therapy sessions.

2. Medical evidence obtained following remand

As noted above, the ALJ first denied plaintiff's application for benefits in a decision filed on January 31, 2004, and the action was remanded by the United States District Court on March 20, 2006, following plaintiff's appeal.  Additional medical records obtained after

remand include materials from Cascadia Behavioral Healthcare and James Bryan, Ph.D, an examining psychologist who conducted a neuropsychological evaluation.

Cascadia Behavioral Healthcare closed plaintiff's case in April, 2004, because of plaintiff's poor attendance. A Mental Health Assessment Update completed when care was reinstated on May 12, 2004, indicated that plaintiff "engages in self-injurious behavior," and noted that plaintiff continued to be depressed and experienced periodic suicidal ideation. Plaintiff was diagnosed with Major Depressive Disorder, recurrent, moderate; Rule Out Borderline Personality Disorder, and PTSD. Her GAF was rated at 40.[1]

During an assessment completed on October 29, 2004, plaintiff indicated that she felt anxious and depressed, and wanted to "correct chemical imbalance." She denied suicidal ideation, and reported that she had last used drugs four or five years earlier. A month later, a counselor was suspicious about plaintiff's denial of current drug use.

On December 8, 2004, plaintiff told her counselor that she was being evicted for arguing loudly with her boyfriend, and that Children's Protective Services was investigating. Plaintiff's speech was slurred, and her hygiene was characterized as "questionable." Her counselor noted that she felt persecuted by others, and opined that she "may be paranoid."

On December 30, 2004, a counselor detected alcohol on plaintiff's breath. When confronted about this during the next counseling session, plaintiff denied that she had used alcohol.

In a chart note dated February 28, 2005, plaintiff's counselor indicated that a Department of Human Services (DHS) caseworker was concerned about plaintiff's ability to provide "quality parenting" for her daughter. The caseworker was concerned about a lack of

---

[1]This score indicates "[s]ome impairment in reality testing or communication (e.g., speech is at times illogical, obscure or irrelevant) Or Major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friend, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home and is failing in school)." Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition Text Revision (DSM-IV-TR), (American Psychiatric Association 2000), at page 34.

consistency in parenting effort and noted that plaintiff became "exasperated and overwhelmed w/burden of home responsibility."

During a session held on June 1, 2005, plaintiff was tearful and expressed fears about losing custody of her daughter.  She was not taking her prescribed medications.

A progress note dated August 30, 2005, indicated that a counselor was unable to contact plaintiff, and that plaintiff had not received services for several months.  Plaintiff's whereabouts were unknown, and the telephone number she had provided was no longer valid.

A progress note dated September 15, 2005, indicated that plaintiff had reeked of marijuana and appeared to be "high" when she visited the agency.  Plaintiff denied using any drugs other than marijuana during the previous two months.  On September 23, 2005, a DHS caseworker reported that she had spoken with plaintiff, and that plaintiff sounded like she had been drinking.

In October, 2005, a Child Welfare caseworker notified plaintiff's counselor that there had been recent evidence that plaintiff was "primarily homeless" living on the streets with her child, and that there was suspicion that she was using drugs.  A subsequent report indicated that plaintiff had been picked up by the police, who had removed plaintiff's child.

In a progress note dated October 5, 2005, plaintiff's counselor reported that she had urged plaintiff to seek housing, "including shelters."  The counselor stated that plaintiff's affect, which was "hyperverbal; upbeat, argumentative when asked to provide ua" gave reason to believe that she was under the influence of a stimulant.  Plaintiff did provide a urine sample, however.[2]

Plaintiff missed an appointment scheduled for November 9, 2005, and called her counselor a week later to report that she had been ill.

---

[2]Though the results of this test are not found in the file, results from drug tests taken in July and August, 2006, were positive for methamphetamine and marijuana.

On February 24, 2006, plaintiff's counselor noted that plaintiff had been recently attacked in the smoking room of her living facility.  During the following week, the counselor accompanied plaintiff to the Multnomah County Courthouse to help her obtain a restraining order against her attacker.  While waiting to appear before the judge, plaintiff filled out an application for employment at a coffee shop.  The counselor noted that plaintiff said she was not sure she could actually work at that time, but was "anxious to have some income" and was "waiting for a decision from Social Security."

In a progress note dated March 16, 2006, plaintiff's counselor indicated that she had learned that plaintiff had been seen smoking drugs the night before outside her building.  When the counselor reported this to plaintiff, she "became very upset and cried, yelled, and would not listen."  Though she acknowledged occasionally smoking marijuana, she said that she would not use anything else because it might affect her ability to have visitations with her daughter.  She also said that she "would not use anything in the future."

On March 22, 2006, Elaine Brady-Mahoney, a counselor at Cascadia Behavioral Healthcare, performed a behavioral health assessment.  After reviewing plaintiff's history, Brady-Mahoney noted that plaintiff presented with a "euphoric mood."  Plaintiff was assessed at a below average intellectual level, and displayed distracted attention, poor judgment, and limited insight.  Her functioning difficulties were assessed as "moderate" for family, "severe" for relationship with partner/friends, "moderate" for housing/finances, and "severe" for work/school/community.  Counselor Brady-Mahoney characterized plaintiff's need to secure transitional housing as a "survival essential" that could afford her the opportunity to focus on a consistent treatment plan and a safe environment in which to improve her socialization skills.  She noted that plaintiff had a history of poor emotional control, and observed that plaintiff's "past episodes of decompensation were also associated w/drug use."  Brady-Mahoney recommended weekly counseling sessions, and recommended that plaintiff pursue a disability determination.  She diagnosed Bipolar II disorder; PTSD; Cannabis abuse, r/o dependence; and Fetal alcohol effects.  Plaintiff's GAF was rated at 43.

On April 10, 2006, plaintiff was reportedly upset when she learned that her food stamps were being cancelled because she had failed to attend an appointment at the food stamp office. Plaintiff's counselor noted that plaintiff stated that she had mental health issues, "and this was making them worse." She added that plaintiff "appears to use this as an explanation of her behavior" at times. The next day, the counselor noted that plaintiff had been "yelling in the lobby" of the food stamp office.

During an appointment with Karan Randhava, M.D., on May 23, 2006, plaintiff reported that she had been increasingly anxious during the previous week, because she was being followed and harassed by a stalker. Dr. Randhava stated that plaintiff was sleeping excessively, but was reluctant to start Wellbutrin until she had moved. Plaintiff told Dr. Randhava that she had not used methamphetamine "for more than 6 months now." Dr. Randhava noted that plaintiff was "easily distracted and has difficulty tracking." She diagnosed plaintiff with PTSD and ADHD "based on longitudinal symptoms, history of difficulty in school with attention, current presentation, and history of meth use to help calm herself." She also diagnosed Methamphetamine dependence, in early remission. Dr. Randhava noted that the "issue of borderline" Personality Disorder had been raised in the past, but opined that plaintiff did not meet the criteria for that diagnosis, because she did not demonstrate "typical characteristics often seen in this disorder." She opined that plaintiff was "quite impaired from her PTSD and ADHD," and rated plaintiff's GAF at 45.

Progress notes from treatment from June, 2006, through October, 2006, indicate continued behavior problems, numerous missed appointments, and urinalyses that were positive for methamphetamine and marijuana. On July 28, 2006, plaintiff admitted having "relapsed," and refused to submit a urine sample for analysis after being told that a refusal was equated to a "positive" drug result. Counselor Brady-Mahoney opined that plaintiff's mental health disorders interfered with her ability to safely care for herself, and suspected that plaintiff was not taking her prescribed medications. On a Verification of Disability form completed for the Housing Authority of Portland on August 28, 2008, Brady-Mahoney

opined that plaintiff had been disabled since 1995.  Brady-Mahoney certified that plaintiff had

> A physical, mental or emotional impairment that is expected to be of long-continued and indefinite duration; substantially impedes his or her ability to live independently; and is of such a nature that ability to live independently could be improved by more suitable housing conditions.

James Bryan, Ph.D., a psychologist, conducted a neuropsychological evaluation on October 6, 2006.  Dr. Bryan conducted a clinical interview, reviewed medical records, reviewed the treatment records from Cascadia, and administered six psychological tests.

Dr. Bryan noted that plaintiff's presentation was consistent with the complaints reported in treatment records and in Dr. Patrick's psychodiagnostic evaluation, which had detailed plaintiff's psychiatric hospitalization.  Plaintiff reported that she took most of her meals at missions and homeless shelters, but had problems with some of the people at those facilities, and sometimes had a "panic, freak out" episode.  Dr. Bryan noted the history of substance abuse described in the Cascadia records, and noted that plaintiff "claims to have no more than one beer on isolated occasions," and claimed that she had last used marijuana about six months earlier.  He also noted that plaintiff reported "no renewed usage of methamphetamine and commented that 'life is so much better without it.' "

Dr. Bryan noted that it had taken four appointments to ultimately conduct plaintiff's evaluation.  Plaintiff had arrived late once, had later left early, had failed to appear for a rescheduled appointment, and had again arrived late.  Dr. Bryan reported that plaintiff's appearance was "moderately disheveled," and that plaintiff had slumped and put her head on the table during the interview.  Plaintiff's psychomotor pace was "moderately lethargic," though she denied having taken any medication, drugs, or alcohol before the appointment. She was cooperative, and her thought processes were characterized as "moderately concrete although logical and coherent."  Dr. Bryan noted "immaturities of interaction style, in terms

of adolescent-like tones and phrasing, mild embarrassed giggling, and awkward, slumped posture." He saw "no clear indication of feigning or exaggeration of symptoms."

As a measure of validity, Dr. Bryan administered a Test of Memory Malingering (TOMM). Plaintiff's score was "within the range of valid effort" on this test.

Plaintiff's Full Scale IQ score was 88, which is in the 21st percentile, and placed her functioning in the "Low Average" intellectual range. Dr. Bryan noted a wide range between plaintiff's Verbal and Performance IQ scales, with differences normally found in only 2% of the population. Plaintiff's Verbal IQ score of 77 placed her in the 6th percentile, in the Borderline intellectual functioning range, while her Performance IQ of 104 was in the Average range. Plaintiff's working memory and processing speed were in the Low Average range, and her Verbal Comprehension Index score was within the Borderline range.

Dr. Bryan concluded that plaintiff's Minnesota Multiphasic Personality Inventory-2 (MMPI-2) test was "validly interpretable," and indicated "strong emphasis upon subjective distress . . . ." He found that plaintiff demonstrated a "very high endorsement of rare and unusual items in a pattern that is interpreted as a 'cry for help' with circumstances beyond her control." Dr. Bryan concluded that plaintiff's anxiety was a "more prominent, chronic feature through the MMPI-2 profile," and that "[d]iagnosis of features of PTSD remains found, on the basis of her tumultuous past, history of child abuse, and past domestic violence episodes." He concluded that, consistent with previous assessments, plaintiff was diagnosed with Major Depression. He added that this represented a recurrent pattern and might be "situationally related," but that plaintiff had "very poor coping resources or internal management skills," and probably experienced "depressive decompensation when experiencing stress, failure, or feelings of abandonment." Dr. Bryan found that Borderline Personality Features continued to be identified "in terms of her tumultuous social relationships, unstable identity, and suicidal ideation with more pronounced gestures and threats when feeling sufficiently stressed."

Dr. Bryan noted that testing revealed plaintiff's "severe language-based deficits." He opined that, though plaintiff had memory deficits, these did not preclude the ability to learn and recall verbal information. Dr. Bryan also noted that plaintiff scored "at and above the Average range for the population for general nonverbal assembly constructional and general perceptual abilities."

Dr. Bryan diagnosed Cognitive Disorder, NOS; Major Depressive disorder, recurrent, moderate, in partial remission; PTSD, provisional; and Borderline Personality features. He did not assign a GAF score.

Dr. Bryan opined that plaintiff should be able to begin a vocational training program if she continued in regularly-scheduled outpatient mental health treatment, maintained adequate medication management, and maintained stabilization of environmental stresses such as housing. He added that

> Employment liabilities will continue to involve her mood volatility and difficulty coping with stressors. Follow-up psychological evaluation should be conducted through her vocational training program, if these problems persist and present prominent barriers to training.

In a Medical Source Statement of Ability to do Work-Related Activities (Mental) that he completed, Dr. Bryan opined that plaintiff's ability to respond appropriately to work pressures in a usual work setting and to changes in a routine work setting were markedly limited.

Hearing Testimony

1. First Hearing

At the first hearing, held in December, 2003, plaintiff testified that she had quit school during the 11th grade because she became homeless. Plaintiff testified that she had been treated by several hospitals and mental health providers, that she experienced overwhelming situations and suicidal ideation, that her mind felt "blotchy," and that she had trouble focusing.

15 - OPINION AND ORDER

Plaintiff testified that she had moved out of the home she shared with her daughter's father because of mental and verbal abuse, and that she had trouble keeping her mental health therapy appointments. She testified that she had received medication for her depression, but did not think that the medications were working, and had not taken them for several months.

Plaintiff acknowledged that she had had a problem with alcohol in her teens, and had smoked marijuana, but had not smoked since approximately 1997. Plaintiff testified that she drank only occasionally. She reported that she had tried to get a job but was not called for interviews. She added that she had worked at a fast-food establishment for about a month, but the job ended because of her mental problems and homelessness. Plaintiff did not think that she could work at that time.

Barry Franklin, plaintiff's friend, also testified at the first hearing. Franklin testified that he had known plaintiff for approximately 4 1/2 to 5 years, and that he saw plaintiff daily. He described plaintiff's life as an emotional roller coaster, and said that plaintiff would have difficulty holding a job because of her emotional stress. Franklin reported that plaintiff had problems with confusion and could not concentrate, and noted that she spoke of suicide at times.

VE Kay Hartgrave testified at the first hearing. The ALJ posed a hypothetical describing a 24-year-old individual with plaintiff's educational and vocational background who was limited to simple, routine, repetitive work, who was not required to have any interaction with the general public, and who had only occasional interaction with coworkers. The VE testified that such an individual could work as an office cleaner, a bakery worker, or a stockroom assistant. When the ALJ added "deficiencies of concentration, persistence and pace such that it interfered with the completion of tasks in a timely manner up to one-third of the workday," the VE testified that the individual could not "hold a job." She also testified that an individual whose concentration, persistence or pace was impaired 20% of the time likewise could not hold even an unskilled position, and that an individual who had two unscheduled, unexcused absences per month could not sustain competitive employment.

2. Second and Third Hearings

      The second hearing was brief.  It was continued after it became apparent that the medical expert needed more time to review the record, and that an updated psychological examination was needed.

      At the beginning of the third hearing, which was held on January 21, 2007, new exhibits were received into the record.  It was noted that Dr. Larry Hart, a Medical Expert, had seen a first set of records from Cascadia and the psychological evaluation, but had not previously seen a second set of records from Cascadia, and was reviewing them when the hearing began.  The ALJ noted that Dr. Bryan's report did not include a GAF assessment.

      Plaintiff testified that she had not worked during the three years since the first hearing.  She said that she had submitted applications for employment, but could not remember when.  Plaintiff testified that she had difficulty communicating with people one-on-one, experienced anxiety in a room full of people whom she did not know, and had emotional difficulties that made it "hard to concentrate."

      Plaintiff testified that she sometimes had trouble taking care of her personal hygiene, and that surviving with little money and assistance was difficult.  She said that she was getting treatment from Cascadia, but it was "not the care" that she needed to help control her anxiety and be better able to cope with society.  Plaintiff reported experiencing anxiety attacks "probably like monthly," during which she was "jittery and sketch, kind of," and had difficulty concentrating.  She added that she was basically "not functioning right."  Plaintiff was not currently taking medications that had been prescribed because she had been given a voucher covering the cost for only a few months.  She had last taken Lexapro approximately six months earlier.  Though it seemed to help, she was not certain that it had improved her functioning.

      Plaintiff testified that she was unable to lift certain weights because of a hernia that she had had since she was seven years old.

17 - OPINION AND ORDER

In response to questioning by the ALJ, plaintiff testified that she had not used illegal drugs since the previous hearing, and that she had consumed very little alcohol. She stated that her six year old daughter no longer lived with her, and that she had not been able to obtain joint custody. Plaintiff testified that she saw her daughter once a week during a supervised visit. She lived in a hotel paid for by Cascadia, and often spent her days sleeping. She sometimes saw friends or went to the library. Plaintiff testified that she attended Alcoholics or Narcotics Anonymous about once a month.

Dr. Hart, a psychologist, testified as a Medical Expert (ME). He identified the listings applicable to plaintiff as 12.04 (affective disorders); 12.06 (anxiety); and 12.09 (substance abuse). He testified that he had "total doubt" about Dr. Bryan's diagnosis of a cognitive disorder, because he did not think that plaintiff had been truthful with him. He added that there may be some reason to doubt the accuracy of plaintiff's IQ score of 77 because "we really don't know if she made a significant effort to it." Dr. Hart noted the discrepancies between plaintiff's testimony that she had not used drugs since the previous hearing and her statements to Dr. Bryan concerning drug use, and the positive results for methamphetamine and cannabis in the drug tests performed during that time.

Dr. Hart indicated that the most common affective disorder applicable to plaintiff was depression, and noted that plaintiff was being treated for PTSD. He also identified items "B through J" under listing 12.04, by which he apparently referred to appetite disturbance with change in weight; sleep disturbance; psychomotor agitation or retardation; decreased energy; feelings of guilt or worthlessness; difficulty concentrating or thinking; thoughts of suicide; and hallucinations, delusions and paranoid thinking. He stated that he did not think that the diagnosis of bipolar disorder had been replicated, and noted that the diagnoses from Cascadia did not confirm that disorder. When asked about listing 12.09, substance abuse, Dr. Hart testified that records from Cascadia showed that plaintiff's methamphetamine and cannabis use "was active through late spring and summer of '06." Noting that there were "scant

references made to alcohol use," he testified that there was insufficient evidence concerning plaintiff's consumption of alcohol.

Dr. Hart's testimony concerning the "B" criteria of the mental listings was partially inaudible.  However, as plaintiff correctly notes, it appears that he indicated that plaintiff would have moderate to marked limitations in her activities of daily living, social functioning, and concentration, persistence, and pace.  Dr. Hart identified plaintiff's hospitalization in 2002 as an episode of decompensation, and opined that plaintiff did not meet the "C" criteria.

In an opinion that is central to this action, Dr. Hart stated that plaintiff's complete abstinence from drug and alcohol use would make a "very significant" difference in plaintiff's functioning related to the "B" criteria.  He further testified that, if plaintiff were in treatment and abstained from the use of alcohol and drugs, her "B" criteria limitations would be "mild to moderate across the board."  Dr. Hart added that, with "some environmental stress factors, she might hit a moderate level."  When asked to explain this latter point, he opined that, based upon "the constitutionality of her psyche of biological disorders," plaintiff would experience a "loss of functioning" in response to some "calamity" in her life.

Dr. Hart appeared to equivocate as to whether plaintiff's diagnosis of borderline personality disorder was correct.  He indicated that he agreed with the diagnosis, but noted two times that the plaintiff's current treating provider discounted that diagnosis.  Dr. Hart also stated that he did not think that the record included the "history" required to support the diagnosis.

Dr. Hart opined that when an individual diagnosed with substance abuse is not receiving treatment "you tend to assume that they are either consistently or periodically using drugs or alcohol."  He opined that Dr. Bryan may have been misled as to the validity of the testing that he administered because he was not aware that plaintiff was using drugs.  However, Dr. Hart acknowledged that Dr. Bryan had read Dr. Patrick's report and records from Cascadia that referred to plaintiff's drug use.

The ALJ did not ask the VE who was present at the hearing to testify because he concluded that the vocational testimony from plaintiff's first hearing "covers the range of possibilities in this case."

<u>Disability Analysis</u>

The ALJ engages in a five-step sequential inquiry to determine whether a claimant is disabled within the meaning of the Act. 20 C.F.R. §§ 404.1520, 416.920. Below is a summary of the five steps, which also are described in <u>Tackett v. Apfel</u>, 180 F.3d 1094, 1098-99 (9th Cir. 1999).

<u>Step One</u>. The Commissioner determines whether the claimant is engaged in substantial gainful activity (SGA). A claimant engaged in such activity is not disabled. If the claimant is not engaged in substantial gainful activity, the Commissioner proceeds to evaluate the claimant's case under Step Two. 20 C.F.R. § 404.1520(b).

<u>Step Two</u>. The Commissioner determines whether the claimant has one or more severe impairments. A claimant who does not have such an impairment is not disabled. If the claimant has a severe impairment, the Commissioner proceeds to evaluate claimant's case under Step Three. 20 C.F.R. § 404.1520(c).

<u>Step Three</u>. Disability cannot be based solely on a severe impairment; therefore, the Commissioner next determines whether the claimant's impairment "meets or equals" one of the impairments listed in the SSA regulations, 20 C.F.R. Part 404, Subpart P, Appendix 1. A claimant who has such an impairment is disabled. If the claimant's impairment does not meet or equal one listed in the regulations, the Commissioner's evaluation of the claimant's case proceeds under Step Four. 20 C.F.R. § 404.1520(d).

<u>Step Four</u>. The Commissioner determines whether the claimant is able to perform work he or she has done in the past. A claimant who can perform past relevant work is not

disabled.  If the claimant demonstrates he or she cannot do work performed in the past, the Commissioner's evaluation of the claimant's case proceeds under Step Five. 20 C.F.R. § 404.1520(e).

Step Five.  The Commissioner determines whether the claimant is able to do any other work.  A claimant who cannot perform other work is disabled.  If the Commissioner finds that the claimant is able to do other work, the Commissioner must show that a significant number of jobs exist in the national economy that the claimant can do.  The Commissioner may satisfy this burden through the testimony of a vocational expert (VE) or by reference to the Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2.  If the Commissioner demonstrates that a significant number of jobs exist in the national economy that the claimant can do, the claimant is not disabled.  If the Commissioner does not meet this burden, the claimant is disabled.  20 C.F.R. § 404.1520(f)(1).

At Steps One through Four, the burden of proof is on the claimant.  Tackett, 180 F.3d at 1098.  At Step Five, the burden shifts to the Commissioner to show that the claimant can perform jobs that exist in significant numbers in the national economy.  Id.

Standard of Review

A claimant is disabled if he or she is unable "to engage in substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  The initial burden of proof rests upon the claimant to establish his or her disability.  Roberts v. Shalala, 66 F.3d 179, 182 (9th Cir. 1995), cert. denied, 517 U.S. 1122 (1996).  The Commissioner bears the burden of developing the record.  DeLorme v. Sullivan, 924 F.2d 841, 849 (9th Cir. 1991).

The district court must affirm the Commissioner's decision if it is based on proper legal standards and the findings are supported by substantial evidence in the record as a whole.  42 U.S.C. § 405(g); see also Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995).

"Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Andrews, 53 F.3d at 1039.  The court must weigh all of the evidence, whether it supports or detracts from the Commissioner's decision.  Martinez v. Heckler, 807 F.2d 771, 772 (9th Cir. 1986).  The Commissioner's decision must be upheld, however, even if "the evidence is susceptible to more than one rational interpretation." Andrews, 53 F.3d at 1039-40.


ALJ's Decision

At the first step of his disability determination analysis, the ALJ found that plaintiff had never engaged in substantial gainful work activity.

At the second step, the ALJ found that plaintiff's severe impairments included a vertebrogenic defect and a history of associated low back pain; a depressive syndrome; an anxiety disorder (PTSD); and a substance abuse disorder, with a history of methamphetamine abuse and ongoing marijuana abuse continuing at least through late 2006.

At the third step, the ALJ found that plaintiff's impairments, including her substance abuse disorder, medically equaled Listings 12.04 (depressive disorder), 12.06 (anxiety disorder), and 12.09 (substance abuse disorder) in the Listing of Impairments; 20 C.F.R. pt. 404, subpt. P, App. 1 (step three with substance abuse).

The ALJ next found that, if plaintiff did not engage in substance abuse, she would continue to experience the other severe impairments that he had identified, including low back pain related to a fracture at L3, as well as impairments related to her depressive disorder and her PTSD.

At the next step in his disability analysis, the ALJ found that, if plaintiff did not engage in substance abuse, she would not have an impairment or combination of impairments that met or medically equaled any of the impairments in the Listings, 20 C.F.R. pt. 404, Subpt. P, App. 1.  In reaching this conclusion, the ALJ stated that Dr. Hart's opinion

and testimony were "highly significant." The ALJ noted that Dr. Hart had "explained that if substance abuse were absent, and the claimant participated in mental health treatment, the limitations resulting from the mental impairments would be less severe." He also cited Dr. Hart's explanation that "there is no evidence of 'C' criteria and only one incident of decompensation, the 2 day hospitalization in 2002," and Dr. Hart's testimony that "there would be only a mild to moderate restriction of activities of daily living; mild to moderate difficulties in maintaining social functioning; and mild to moderate difficulties in maintaining concentration, persistence, or pace" in the absence of substance abuse.

In the next step of his analysis, the ALJ concluded that, if plaintiff stopped her substance use, she would have the residual functional capacity required to perform light exertional level activities, if she had no interaction with the public, had only occasional contact with coworkers, and was limited to simple, routine, repetitive work.

In the final step of his disability analysis, the ALJ found that, considering her age, education, work experience, and residual functional capacity, plaintiff could perform a significant number of jobs that existed in the national economy if she stopped her substance use. In reaching this conclusion, the ALJ cited the VE's testimony during the first hearing, held on December 9, 2003, that an individual with plaintiff's age, education, experience, and residual functional capacity could work as an office cleaner, a bakery worker, and a stock room worker. Pursuant to SSR 00-4p, the ALJ concluded that the VE's testimony was consistent with the information in the Dictionary of Occupational Titles. Based upon the VE's testimony, the ALJ concluded that, if plaintiff discontinued her substance use, she would be capable of making a successful adjustment to work that existed in significant numbers in the national economy, and therefore was not disabled within the meaning of the Act.

Discussion

Plaintiff asserts that, in earlier proceedings before this court, Magistrate Judge Papak resolved all of the issues that were before him in her favor, except for the ALJ's failure to fully develop the record and his improper rejection of lay witness evidence. She further asserts, without supporting argument, that the issues that Magistrate Judge Papak resolved in her favor are again before the court, and that the ALJ has again improperly rejected the opinions of Drs. Earnest, Read, and Patrick, and has compounded that error by improperly rejecting the opinion of Dr. Bryan and relying on the opinion of Dr. Hart, the non-examining ME.

Plaintiff contends that the ALJ erred by improperly finding that her substance use was material to her disability, and by failing to ask the VE whether her testimony was consistent with the Dictionary of Occupational Titles (DOT).[3] Unlike the contentions that are set out in the preceding paragraph, plaintiff has set out significant arguments in support of these latter assertions. I therefore consider these as the issues central to this action, and will address them in greater detail than the arguments cited in the preceding paragraph.

1. Plaintiff's assertion that Magistrate Judge Papak resolved most issues in her favor, that those resolved issues are again before the court, and that the ALJ improperly rejected the opinion of Dr. Bryan and credited the opinion of Dr. Hart

I need not address these contentions at length: Though plaintiff raises these issues as if they were matters of fact, she does not support these assertions or rely on them to any significant degree in her supporting memoranda. However, I note for the record my conclusion that a careful reading of Magistrate Judge Papak's Findings and Recommendation does not support plaintiff's assertion that all issues plaintiff raised in her first action before

---

[3]Plaintiff's reply brief is devoted entirely to the contention that the ALJ committed reversible error by failing to ask the VE whether her testimony concerning the demands of the jobs cited was consistent with the DOT.

the district court were resolved in her favor.  The Commissioner correctly notes, for example, that Magistrate Judge Papak rejected plaintiff's assertion that the ALJ had failed to adequately address the opinion of Dr. Worthen, and her assertion that the evidence clearly established that plaintiff could not perform substantial gainful activity: If plaintiff's inability to perform substantial gainful activity had been established, Magistrate Judge Papak would have recommended that the action be remanded for an award of benefits rather than for further proceedings.

A fair reading of the ALJ's second opinion supports the conclusion that the ALJ fully complied with the remand order.  Though plaintiff asserts that the ALJ improperly rejected the opinions of Drs. Earnst, Read, and Patrick because be found that a possible cognitive disorder, bipolar disorder, and borderline personality traits did not constitute severe impairments, she has cited no ways in which the ALJ erred in his assessment of these physicians.  In the absence of the citation to any specific error, the Commissioner correctly notes that the ALJ did in fact provide specific and legitimate reasons, supported by substantial evidence in the record, for his assessment of these medical source opinions.

2. ALJ's conclusion that plaintiff's substance use was material to her disability

In 1996, Congress amended the definition of disability under the Social Security Act to provide that "[a]n individual shall not be considered to be disabled . . . if drug addiction or alcoholism would . . . be a contributing factor material to the Commissioner's determination that the individual is disabled."  42 U.S.C. § 423(d)(2)(C).  In determining whether substance abuse is a contributing factor that is material to the determination of disability, the "key factor" is whether the individual in question would still be found to be disabled if he or she stopped using drugs or alcohol.  20 C.F.R. § 404.1535(b)(2).  In evaluating whether an individual would be disabled if he or she stopped using drugs or alcohol, the Commissioner is required to examine which of the claimant's physical or mental limitations would remain

if the individual stopped using drugs or alcohol, and then determine whether any of the remaining limitations would be disabling.  20 C.F.R. § 404.1535(b)(2).

A. Analysis of plaintiff's condition with substance abuse

As noted above, the ALJ found that plaintiff's severe impairments included a vertebrogenic defect and a history of associated low back pain, a depressive syndrome, an anxiety disorder of PTSD, and a substance abuse disorder, with a history of methamphetamine abuse and ongoing marijuana abuse that continued at least through late 2006.  In reaching this conclusion, the ALJ relied on the testimony of the ME, and provided specific and legitimate reasons for rejecting diagnoses of a cognitive disorder, bipolar disorder, and borderline intellectual functioning.  The ALJ found that plaintiff's impairments, which included a substance abuse disorder, medically equaled sections 12.04, 12.06, and 12.09 of the Listings.

This finding was supported by substantial evidence in the medical record, and by the testimony of Dr. Hart, the ME.  Dr. Hart testified that the medical record he had reviewed supported that conclusion that plaintiff's depressive syndrome, PTSD, and a substance abuse disorder were severe impairments.  He explained that the record did not support the diagnosis of a cognitive disorder, which Dr. Patrick had referenced in his consultative evaluation, and which Dr. Bryan had diagnosed in his evaluation.  He also testified that plaintiff's medical history did not support the diagnosis of borderline personality disorder made by Drs. Earnest and Bryan.  Dr. Hart reasoned that these diagnoses were suspect because plaintiff had not been truthful with her treating and examining medical sources, and had withheld relevant information that substantially impacted assessment of her functioning and related diagnoses. This assessment is supported by the record.  Though Dr. Bryan cited some evidence of plaintiff's substance abuse in the record, he noted that plaintiff claimed to have last used marijuana six months earlier, and told him that she had stopped using methamphetamine, and that life was "so much better without it."

Dr. Hart's assertion that Dr. Bryan based his diagnoses and assessment as to plaintiff's condition in part on misinformation concerning her ongoing substance abuse is supported by the record. As the Commissioner notes, Dr. Bryan did not diagnose substance abuse, either by history or currently. In the absence of such a diagnosis, Dr. Hart's assertion that Dr. Bryan was not aware of plaintiff's ongoing drug use, which was amply documented in the Cascadia records, is well founded. Though, as Dr. Hart acknowledged, Dr. Bryan had access to and summarized the Cascadia records, his failure to diagnose substance abuse supports the conclusion that he was unaware that she was engaging in substance abuse, and thought that she had not engaged in substance abuse for a substantial time. Dr. Hart correctly noted that the objective treatment record established that plaintiff's substance abuse was ongoing, and included notations that plaintiff often arrived late for appointments, failed to appear for many appointments, was observed to have alcohol on her breath, reeked of marijuana and appeared to be under its influence, was observed smoking drugs, and had provided several urine samples that were positive for both methamphetamine and marijuana. Dr. Bryan made no mention of these incidents.

The ALJ provided legally sufficient reasons for his rejection of some of Dr. Bryan's diagnoses, and for concluding that Dr. Bryan's opinions did not reflect the evidence of plaintiff's ongoing substance abuse. As the Commissioner correctly notes, an ALJ may reject medical opinion that is based upon a claimant's reports that are not credible. Tommasetti v. Astrue, 533 F.3d 1035, 1041 (9th Cir. 2008). There was ample evidence that plaintiff had not accurately disclosed her substance abuse to Dr. Bryan, and that Dr. Bryan was not aware of the extent of her substance use. Dr. Hart, the ME, opined that Dr. Bryan's diagnoses were suspect because he was not fully aware of plaintiff's substance abuse, and explained that the absence of that information substantially affects the assessment of an individual's functioning, test results, and resulting diagnoses. Faced with conflicting medical evidence, an ALJ must make credibility determinations and resolve the conflicts. Thomas v. Barnhart, 278 F.3d 947, 956-57 (9th Cir. 2002). The ALJ did so here, and provided clear and

convincing reasons for rejecting some of Dr. Bryan's diagnoses.   In addition, the ALJ's

conclusion that the severe impairments which he did credit, including a substance use

disorder, medically equaled impairments listed in sections 12.04, 12.06, and 12.09 of the

Listing of  Impairments, was fully supported.


B. Conclusion that plaintiff's substance use was material to determination that plaintiff is

disabled

Plaintiff contends that the ALJ erred in finding that she would not be disabled if she

discontinued her substance use because "when (as here) there is no affirmative evidence that

the claimant's condition would cease to be disabling in the absence of substance abuse, a

finding of not material must be made."  Plaintiff's Opening Memorandum at 31.  [Emphasis

in original.]  She also asserts that the ALJ erred in basing his findings on Dr. Hart's

"unsupported testimony" that plaintiff's "B" criteria, which includes activities of daily living,

social functioning, and concentration, persistence, or pace, plus episodes of decompensation,

would improve from "moderate to severe" to "mild to moderate" in the absence of substance

abuse.  Id. at 30.  Plaintiff contends that Dr. Hart's testimony was based upon his erroneous

belief that Dr. Bryan was unaware of her drug use that was reflected in Cascadia's records,

and contends that Dr. Hart's testimony is "completely defused" if Dr. Bryan was aware of her

drug use.  Id. at 31.  She contends that the medical records show that she has used drugs

"almost continually," and that there is no evidence that she "is any different with or without

alcohol and drugs."  Id. at 31-32.

Based upon a careful reading of the ALJ's decision and relevant portions of the

record, I conclude that the ALJ provided legally sufficient support for his conclusion that

plaintiff would not be disabled, and would have the capacity to perform light exertional level

work activities with certain restrictions, if she discontinued substance abuse.  In reaching his

conclusions, the ALJ relied on Dr. Hart, who had reviewed pertinent portions of the medical

record.  The ALJ cited Dr. Hart's testimony that, if plaintiff did not engage in substance

abuse, and participated in mental health treatment, the limitations resulting from plaintiff's mental impairments would be less severe, and "there would only be a mild to moderate restriction of activities of daily living; mild to moderate difficulties in maintaining social functioning; and mild to moderate difficulties in maintaining concentration, persistence or pace." The ALJ also cited Dr. Hart's testimony as to the absence of "evidence of 'C' criteria and only one incident of decompensation, the 2 day hospitalization in 2002."

The ALJ also relied on lay witness statements provided by Mike Lamb, the father of plaintiff's daughter, who had custody of plaintiff's daughter. The ALJ noted that the record indicated that Lamb was not engaging in substance abuse, and that plaintiff's substance abuse was a factor in Lamb's estrangement from plaintiff, who had only supervised visits with her daughter. The ALJ noted that, though Lamb indicated that plaintiff was affected by depression and sometimes exhibited symptoms, he described plaintiff as "relatively functional; shopping, going out; able to do household activities; taking walks and using public transportation; being financially responsible and paying bills; and caring for a 10 month old infant." The ALJ noted that Lamb reported that plaintiff had abstained from substance abuse for more than three years when Lamb provided this information, and characterized Lamb's reports as "informative, providing a reasonable portrayal of the claimant and her abilities when active substance abuse is absent, and when she is evidently participating in mental health treatment." He added that plaintiff's "functional level is significantly higher and the complications noted as being present when substance abuse is active, or when substance abuse is in remission but there is no mental health treatment, are not a factor."

The ALJ concluded that "the record as a whole shows the claimant to have greater abilities and better functioning than she alleges; she often does not take prescribed medication; she complies with treatment when it is in her best interest to do so, as in obtaining housing and support, but is generally non-compliant; when challenged regarding unacceptable behavior she invariably denies it; when the issue of her non-compliance is

raised, the claimant becomes abusive, threatens to file a grievance against the individual raising the issue."  He further observed that plaintiff did not look for work, and that there was no evidence that plaintiff had participated in vocational rehabilitation. The ALJ concluded that plaintiff was "a physically healthy young woman, with sufficient intelligence, and a demonstrated ability to deal with adversity, who is capable of taking control of her future."

The ALJ provided substantial support for his conclusion that plaintiff would not be disabled if she discontinued her substance use.  He cited the testimony of the ME, who had reviewed pertinent portions of the record, and cited material in the record supporting the conclusion that plaintiff's functioning had been substantially less impaired during a substantial period when she was not using substances.  Having determined that plaintiff would not have the residual functional capacity to perform the full range of light work even if she discontinued substance use, the ALJ relied on the VE's testimony that an individual with plaintiff's age, education, experience, and residual functional capacity could perform work that existed in significant numbers in the national economy.  His conclusion that plaintiff was not disabled within the meaning of the Act was supported by substantial evidence, and was not based upon legal error.


3. <u>ALJ's failure to ask VE about possible conflict between testimony and DOT</u>

Social Security Ruling (SSR) 00-4p provides that, when a VE testifies concerning the requirements of a job or occupation, an ALJ has an "affirmative responsibility to ask about any possible conflict between" the VE's evidence and the information provided in the DOT. SSR 00-4p further provides that an ALJ "will ask" the VE "if the evidence he or she has provided" is consistent with the DOT, and obtain a reasonable explanation for any apparent conflict.

In <u>Massachi v. Astrue</u>, 486 F.3d 1149, 1152 (9th Cir. 2007) the Ninth Circuit addressed for the first time the question "whether, in light of the requirements of SSR 00-4p, an ALJ may rely on a vocational expert's testimony regarding the requirements of a particular

job without first inquiring whether the testimony conflicts with the *Dictionary of Occupational Titles*." The Massachi court held that "an ALJ may not." Id.

Here, both of plaintiff's hearings before the ALJ were conducted before the Massachi decision was issued. As noted above, a VE testified during the first hearing, but not during the second hearing. During the first hearing, the VE testified that an individual with plaintiff's age, education, and experience, and who had the residual functional capacity assessed by the ALJ, could work as an office cleaner, a bakery worker, and a stockroom assistant. The VE referred to the DOT classification numbers and exertional levels for these positions. However, she was not asked whether there was any conflict between her testimony concerning these jobs and the DOT.[4]

Relying on Massachi, plaintiff contends that this action must be reversed, and at the least, remanded for further proceedings, because the ALJ did not ask the VE whether there was any conflict between her testimony and the DOT. I disagree. Certainly, the Massachi court did hold that an ALJ must inquire as to whether a VE's testimony conflicts with the DOT, and the court remanded the action so that the ALJ could "perform the appropriate inquires under SSR 00-4p." Id. at 1152, 1154. And here, the ALJ erred in failing to ask the VE whether her testimony conflicted with the DOT, and, if so, whether there was a reasonable explanation for the conflict. However, the Massachi court noted that this sort of "procedural error" may be "harmless" if there is no conflict between the VE's testimony and the DOT, or if the VE provides enough support for her conclusions "as to justify any potential conflicts . . . ." Id. at 1154 n. 19.

In Massachi, the VE's failure to inquire was not harmless because the court concluded there was "an apparent conflict with no basis for the vocational expert's deviation." Id. Here, however, assuming that Massachi should be applied retroactively, I am satisfied that the ALJ's error was harmless. As the Commissioner correctly notes, an ALJ may take

_____

[4]As noted above, in his decision, the ALJ referenced SSR 00-4p, and stated the VE's testimony was consistent with the information in the DOT.

administrative notice of any reliable job information, including information provided by a VE, <u>Johnson v. Shahala</u>, 60 F.3d 1428, 1435 (9th Cir. 1995), and the Social Security Administration takes administrative notice of "reliable job information" available in the DOT. 20 C.F.R. § 416.966(d). The ALJ here specifically found that the VE's testimony was consistent with the information included in the DOT, and specifically cited SSR 00-4p. Plaintiff contends that there is no support for that conclusion. However, the agency takes administrative notice of the DOT, the ALJ's assertion that the VE's testimony was consistent with the DOT at least implies that the ALJ reviewed the relevant portions of the DOT, and the ALJ's citation to SSR 00-4p indicates his awareness that a VE's testimony must be consistent with the DOT, or that any inconsistency must be reasonably explained. In addition, plaintiff has cited no actual or apparent conflict between the VE's testimony and the DOT, and no such conflict appears to exist between the VE's testimony and the DOT job classifications for the jobs the VE identified.[5] Here, unlike in <u>Massachi</u>, there is no "apparent conflict" between the VE's testimony and the job descriptions in the DOT. Accordingly, the VE's error was harmless, and remand for further proceedings is not appropriate.


Conclusion

Plaintiff's request for an Order reversing the Commissioner's decision and remanding for an award of benefits or for further proceedings is DENIED.

DATED this 30th day of September, 2009.


/s/ John Jelderks
John Jelderks
U.S. Magistrate Judge

---

5 The Commissioner submitted copies of the relevant DOT job classifications with its memorandum.